Filed 7/2/25  In re N.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D085210 |
| Plaintiff and Respondent, | (Super. Ct. No. J521099AB) |
| v. | |
| R.W., | |
| Defendant and Respondent; | |
| N.W. et al., | |
| Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Reversed and remanded with instructions.

Patricia K. Saucier, under appointment by the Court of Appeal, for Appellant, Na.W.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Appellant, Ni.W.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Respondent.

Na.W. and Ni.W. (Children) appeal from the juvenile court's orders of legal guardianship as the permanent plan at the Welfare and Institutions Code[1] section 366.26 hearing.  At the hearing, the court found the Children adoptable but ruled that the beneficial parental relationship exception applied to R.W. (Father).

The Children contend, and the San Diego County Health and Human Services Agency (Agency) agrees, that the juvenile court erred by finding that exception applied because:  (1) Father was not consistently visiting and contacting the Children by the end of the case; (2) the Children's relationship with Father was not a substantial, positive, and emotional one given that they feared being alone with Father and suffered emotional trauma from earlier experiences with him; and (3) the detriment of severing that relationship did not outweigh the security and stability of an adoptive home.

We agree with the Children and the Agency.  Therefore, we reverse the court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Detention and Initial Hearings*

On September 3, 2022, the Agency detained the Children, ages eight and two, after Father was transported to the hospital by paramedics due to heavy intoxication.  At the time, the home was unsanitary and unsafe, with

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

open liquor bottles and pill bottles accessible to the Children. The Children's mother (Mother) no longer lived in the home and was unable to care for them.[2] On those bases, the Agency filed juvenile dependency petitions under section 300, subdivision (b).

After detention, Father admitted to drinking a pint and a half of alcohol daily. He also admitted using prescription pills. Na.W. stated that Father "sometimes . . . takes too many pills and sleeps all day," and she takes care of her younger sister and cleans the home. Father continued drinking after removal of the Children. The Agency also believed that Father had mental health issues, including suicidal ideations, and had been abusive toward Mother.

At the detention hearing, the juvenile court found that the Agency made a prima facie showing under section 300, subdivision (b) and ordered continued placement of the Children outside of Father's home, with liberal supervised visitation with the parents. Father visited the Children and registered for parenting classes. The Children looked forward to seeing him for visits.

Several months later, the court held a contested jurisdiction and disposition hearing. At the hearing, the court made a true finding on the petition, declared the Children dependents of the court, found clear and convincing evidence to remove the Children from the parents' custody under section 361, subdivision (c), and maintained the Children's placement. The court also ordered reunification services and visitation for the parents, which for Father would be structured, unsupervised visitation.

B. *Six-Month Review Period*

---

[2]    We do not discuss Mother in detail because she is not involved in this appeal.

After the initial hearings, Father worked toward maintaining sobriety. He completed a 30-day substance abuse program and began a six-month residential treatment program. He continued consistently visiting the Children. Na.W. was sad at the end of these visits.

By the continued six-month review hearing in August 2023, Father made adequate progress toward resolving the issues causing detention. The court maintained the Children's placement and ordered liberal unsupervised visitation for Father.

C. *Twelve-Month Review Period*

Following the six-month hearing, Father maintained consistent visitation, remained in inpatient substance abuse services, and completed parenting classes. The Children looked forward to and enjoyed Father's visits. The Agency noted that he "consistently participat[ed] in visits and utilize[d] the skills from his case plan services."

At the end of August 2023, the Children were placed with maternal relative caregivers Steve and Shavonte and did well in the home.

At the 12-month review hearing in November 2023, the court noted that Father had consistent contact and visits with the Children and made significant progress on the issues leading to removal. Accordingly, the court ordered overnight visits for Father and set an 18-month review hearing.

D. *The Agency's Section 388 Petition*

On January 5, 2024, Father successfully completed his inpatient treatment program. On January 18, 2024, Father tested positive for alcohol use. He denied having consumed alcohol, blaming the positive result on energy drinks.

Na.W. felt anxious about returning to Father's care. During an overnight visit with Father on January 26, 2024, Na.W. called her Mother,

4

asking to be picked up by her caregivers because of Father's alcohol use. Na.W. stated, "Dad is scaring us, he is throwing up and sick." Father had ordered pizza and then fallen asleep. Police arrived to remove the Children from his care. Father was extremely intoxicated and appeared unable to care for the Children. He was verbally aggressive toward the officers.

After the incident, Na.W. reported to the Agency that Father was drunk during the visit and, when she asked him if he was drunk, he told her to "mind your own business before I slap you." She stated he swore at the police when they arrived and she did not feel safe during visits with Father. She did not want to be left alone with him.

Ni.W. also stated that Father was drunk and mimicked throwing up. She indicated that he scared her.

Based on this incident, the Agency brought a petition under section 388 requesting a change in the court's order from overnight visits back to supervised visitation for Father. The Agency also reported that, a few days after the overnight visit, law enforcement responded to a domestic violence call involving Father, who had grabbed Mother's throat and appeared to be under the influence of alcohol. Police arrested him for battery.

After the overnight visit incident, Father stopped participating in weekly visits. The Agency made multiple telephone and in-person attempts to contact Father, but he did not respond, and the Agency was unsure of his whereabouts until February 22, 2024. He did not participate in two child and family team meetings, despite the Agency's request that he participate.

In February 2024, the court held a hearing on the Agency's section 388 petition, granting the petition and ordering Father's visitation to revert to supervised visits.

E. *Eighteen-Month Review Period*

When the Agency reached Father, he expressed an intention to visit with the Children and explained he recently had back surgery. The Agency acknowledged that may have affected his ability to visit. Beginning in early March, Father maintained regular contact with the Agency and participated in twice weekly telephonic visits. He expressed the intention to re-engage substance abuse services but was unable to do so immediately. Father declined to take a drug test as requested by the Agency. During a March 14, 2024, telephonic call, the supervising social worker was concerned that Father had been drinking alcohol. Father denied the claim, explaining he was sleepy and on medication following his surgery.

The Children continued to express concern about being alone with Father and displayed signs of emotional trauma, such as sadness and anger, when discussing him.

The Agency was concerned about Father's relapse shortly after completing his program when outside of a structured program, his lack of insight regarding his ability to maintain sobriety and its effect on the Children, and his continued contact with Mother after the domestic violence incident. Consequently, by the time of the 18-month review hearing, the Agency did not believe there was a substantial probability that the Children would reunify with Father or that extending the reunification period to 24 months was in the best interest of the Children. It recommended terminating reunification services and setting a section 366.26 hearing. The Children agreed with the Agency's recommendation to terminate services.

Father sought an extension of the reunification period, contending the Children would likely be returned to Father with additional services given his prior progress toward reunification. His counsel noted Father took responsibility for his relapse and explained that he had an upcoming

6

scheduled intake for additional services, but there is a waiting list for residential services.

At the contested 18-month review hearing, the court found Father's progress in the case to be minimal, terminated reunification services, and set a section 366.26 hearing. Because Father had not continued substance abuse treatment after completing the inpatient program, the court declined to find a substantial probability that the Children would be returned within 24 months or other good cause to extend services. The court noted the Children's fear related to Father's behavior after consuming alcohol.

F. *Post-service Termination Period and the Section 366.26 Hearing*

In June 2024, police responded to another domestic violence incident after Mother slapped Father. Police reported that Father was visibly intoxicated. Mother was arrested.

In September 2024, Father brought a section 388 petition requesting the court to change its order terminating reunification services. Father asserted that the change was proper because he completed additional inpatient treatment in May 2024. The Agency noted that the 24-month date had passed, which would result in the return of the Children to Father if the court granted the petition. Given the absence of evidence supporting a change in circumstances aside from the five-month-old completion of treatment, the Agency opposed a prima facie finding on the motion and the return of the Children to Father. According to the Agency, that circumstance did not amount to a resolution of the outstanding alcohol issue. The Children agreed, also noting the petition did not allege Father had been visiting consistently since his visits reverted to supervised visits. After a hearing, the court found that Father did not make a prima facie case on the section 388 motion.

7

Leading up to the section 366.26 hearing, the Agency reported that Father's contact with the Children had decreased. After the termination of reunification services, Father only visited in person once. He called the Children approximately once a month. He appeared to the caregivers to be under the influence during some calls, which upset the Children at times. Calls were "sporadic" and lasted "less than 10 minutes."

The Agency reported that Na.W. "did not want to return to living with her father because it was too much for her to take care of her father and her little sister." Na.W. wanted to be adopted. According to her therapist, Na.W. "shut down" and would not engage with the therapist after visits with the parents. Ni.W.'s therapist reported she screamed and had difficulty calming down after in-person visitation.

After a continuance to determine the most appropriate permanent plan for the Children, the section 366.26 hearing took place in October 2024. Father testified that the Children love him, love seeing him, and had fun during their unsupervised visits. He believed they would be sad if they never saw him again. After his visitation reverted to supervised visits, he explained he did not visit certain times because he had no money to spend on the Children. He also explained that the caregiver sometimes does not pick up the phone when he calls to speak to the Children, even during his set time to call. He denied being under the influence of alcohol during calls with them.

Father contended that the beneficial parental relationship exception applied and sought the permanent plan of adoption. He argued the exception to adoption applied because: (1) his attempt to make phone calls evidenced a "consistent effort of visitation" to the extent permitted by the caregiver; (2) the calls were positive and the Children's enjoyment of earlier in-person

8

visitation demonstrated their bond with Father; and (3) the bond outweighed the benefit of placement.

The Agency contended that the exception did not apply because: (1) Father had only one in-person visit since visitation reverted to supervised and only occasional calls, not always calling during his twice weekly times; (2) there was not a substantial positive emotional attachment after the Children's "painful" and "disappoint[ing]" experiences with Father such that Na.W. expressed the desire to be adopted; and (3) any bond did not outweigh permanency of adoption. According to the Agency, the quality of Father's relationship with the Children suffered as a result of the infrequent contact and contact occurring while Father was under the influence of alcohol. The Children were thriving in their placement, and the caregivers were willing to adopt them and "eager to provide them with a permanent, safe and loving home."

The Children agreed with the Agency, with Na.W. stating she would like to be adopted but have contact with Father.

The court found that the Children were adoptable but ordered legal guardianship as the permanent plan, finding the beneficial parental relationship exception applied. First, the court stated that Father had consistent visitation "during the majority of the case," including phone contact since reunification services terminated. Based on Father's credible testimony and supporting text messages, the court found that the caregiver's actions limited his phone contact with the Children. Second, the court found that a substantial positive relationship existed benefitting the Children because they loved Father, enjoyed and looked forward to in-person visits, and wanted to continue to have visits and contact with him. Third, the court found, the Children's desire to have a continued relationship with Father

9

demonstrated that the harm of severing the relationship outweighed placement in an adoptive home.

G. *Post-section 366.26 Hearing Period*

The Children filed this appeal of the legal guardianship order. We issued an order deeming Father a respondent.

Meanwhile, the Agency filed a section 388 petition with the juvenile court to change the order of legal guardianship as the permanent plan. The change in circumstances were "the children's really strong emotional reaction to learning of a legal guardianship order [and] the continued phone calls to the home with the parents having fights and being drunk." The Children joined in the Agency's argument. Na.W. in particular was "really upset about the court's ruling" and "really wishes to be adopted." She wanted "to be done with this legal process . . . and fe[lt] really frustrated and disappointed that her father continues to call her while drunk." The court found that the Agency had met its prima facie burden and set a contested section 388 hearing. At the January 24, 2025, contested hearing, the court granted the section 388 petition to permit the Agency to conduct a further assessment regarding the permanent plan and set a new section 366.26 hearing.[3]

DISCUSSION

On appeal, the Children each contend that the juvenile court erred in applying all elements of the beneficial parental relationship exception. The Agency submitted a letter joining with the Children's argument. In his respondent's brief, Father contends only that the Children's appeal is moot

---

[3]    As requested by the Agency, we take judicial notice of the juvenile court's January 24, 2025, ruling as background for the parties' arguments on appeal. (Evid. Code, §§ 452, subd. (d)(1), 459.) We also take judicial notice of the court's May 27, 2025, order setting the contested section 366.26 hearing for July 22, 2025.

due to the court setting a new section 366.26 hearing. We conclude the appeal is not moot because, at the time of this opinion, the court's ruling is still in effect[4] and the alleged error could affect the outcome of the subsequent proceedings. (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 769 ["An issue is not moot if the purported error infects the outcome of subsequent proceedings"].)

At section 366.26 hearings, the court's goal is to select and implement a permanent plan for the Children. (*In re Caden C.* (2021) 11 Cal.5th 614, 630.) If "there has been a previous determination that reunification services be terminated" and the court "determine[s] by clear and convincing evidence . . . the child is likely to be adopted," the court must terminate parental rights unless a statutory exception applies. (*Id.* at pp. 630–631.)

One such exception is the section 366.26, subdivision (c)(1)(B)(i) beneficial parental relationship exception, which requires a parent to prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C., supra*, 11 Cal.5th at p. 631.) This exception "is limited in scope." (*Id.* at p. 631.) It applies when " 'severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child." (*Id.* at p. 633.) In other words, "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the

---

4 The court granted the section 388 petition to permit the Agency to conduct a further assessment regarding the permanent plan, which the court will evaluate at another section 366.26 hearing. The court does not appear to have set aside the prior order.

child *due to'* the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) Throughout this analysis, "the focus is on the best interests of the child." (*Id.* at p. 632.)

1. *Regular Visitation and Contact*

In examining the regular visitation and contact element, "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*In re Caden C., supra*, 11 Cal.5th at p. 632.) We review the court's determination as to this element for substantial evidence. (*Id.* at p. 639.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Id.* at p. 640.)

Here, it is questionable whether substantial evidence supports the juvenile court's finding that Father had consistent visitation and contact with the Children to the extent permitted throughout the case. Court orders permitted weekly in-person visits and twice weekly telephone calls. While Father visited consistently until the January 26, 2024 overnight visit, he visited in person only once between that date and the October 2024 hearing, cancelling or failing to schedule other visits. After having back surgery, Father resumed twice weekly telephonic visits in early March 2024. The Agency reported, however, by the July 2024 reporting period, Father's calls during to the Children decreased to once a month.

The juvenile court found Father's testimony credible that he attempted to call the Children more frequently, but the caregiver did not allow it. Even considering these attempts to call, the evidence shows irregular attempts to contact, fewer than the twice weekly calls permitted by court order. The text messages Father provided show that he attempted to call the caregiver to

12

speak with the Children on April 30, May 6, June 10, June 17, June 18, July 4, July 15, July 29, August 6, August 7, August 14, September 23, September 25, October 7, October 9, October 10, October 14, October 16, and October 17.  Although this amounts to less than half the twice-weekly calls permitted by the court order, we cannot discount the possibility that Father was deterred from calling more frequently because his attempts were unsuccessful.

We need not decide this question, however, because we conclude that Father failed to meet his burden of proving the other two elements of the beneficial parental relationship exception.

2. *Substantial, Positive Attachment*

To satisfy the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*In re Caden C., supra*, 11 Cal.5th at p. 636.)  Factors involved in determining the benefit of the relationship include " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.)  "A positive attachment between parent and child . . . is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the parent as more than a mere friend or playmate." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)  The required "significant attachment" arises from an "adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

We review the court's determination on this element for substantial evidence.  (*In re Caden C., supra*, 11 Cal.5th at p. 639.)

Although the record shows that the Children had some relationship with Father and wanted to continue to have contact with him, substantial evidence does not support the finding that the relationship was a substantial, positive, and nurturing one that benefitted the Children at the time of the section 366.26 hearing.  Rather, the record demonstrates the Children experienced significant negative effects from interactions with Father arising out of their exposure to his substance abuse.  While "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," they may have a negative effect on the children such that they are relevant to determining the benefit of continuing the relationship.  (*In re Caden C., supra*, 11 Cal.5th at pp. 637–638.)

Here, the Agency reported both Children were afraid of being with Father.  Na.W. was anxious about beginning overnight visits and refused to be alone with Father after the January 24, 2024, overnight incident when he threatened to slap her and was too intoxicated to take care of the Children.  After that night, the Agency reported that Children displayed signs of emotional trauma, such as sadness and anger, when discussing Father.  Father continued to call the Children while under the influence, leaving them upset at times.  Na.W. consistently expressed a preference for adoption.  She did not want to live with Father "because it was too much for her to take care of her father and her little sister."  While four-year-old Ni.W. was too young to understand the difference between adoption and legal guardianship, she wanted to remain living with her caregivers as her "forever home" rather than living with her parents.  In sum, while we acknowledge Father loves the

14

Children, they lacked the sense of security and stability with Father to establish the type of positive relationship required to apply this exception.

The juvenile court failed to mention this evidence of negative effects of the parental relationship on the Children. Instead, it based its finding of a substantial, positive relationship on the Children's enjoyment of visits with Father before the January 24, 2024, overnight. That evidence does not establish a substantial emotional attachment to Father as a nurturing parental figure who provides a sense of security and stability, but rather a relationship more akin to that of a friend or playmate. Nor does that evidence negate the trauma experienced by the Children when Father was too intoxicated to care for them. Further, after visitation reverted to supervised visits, Father's short, sporadic phone calls in lieu of in-person visits did not provide the opportunity for the Children to establish or maintain the requisite significant relationship with him.

3. *Detriment from Termination*

To determine whether "termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*In re Caden C., supra*, 11 Cal.5th at p. 632.) This determination is based on "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.) Some "relationship[s] involve[ ] tangled benefits and burdens" which the court must "disentangl[e]." (*Ibid.*) Courts may "find that

15

terminating a relationship with negative aspects would have some positive effects that weigh in the balance—and may tip it in favor of severing the parental relationship to make way for adoption." (*Id*. at p. 635.) As with the second element of the exception, the parent's struggles leading to dependency may be relevant to determining whether terminating the relationship would be detrimental to the child. (*Id*. at pp. 637–638.)

We review underlying factual determinations for substantial evidence, but "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*In re Caden C., supra*, 11 Cal.5th at p. 640.)

Although we appreciate the difficulty of a decision that could terminate the relationship between a father and his children, we conclude the court abused its discretion by finding that the harm of severing the relationship outweighed placement in an adoptive home merely because the Children had experienced enjoyable visits many months prior and wanted to continue to have some contact with Father. "A ' "showing [that] the child would derive *some* benefit from continuing a relationship maintained during periods of visitation" ' is not a sufficient ground to depart from the statutory preference for adoption." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818.) At this stage of the proceedings, after reunification services have been terminated, "to justify withholding the 'security,' 'stability,' and ' "sense of belonging a new family would confer[,]" ' " there must be "some type of harm beyond the fact that [a parent's] loving visits would cease." (*Id*. at p. 820.) Here, the record contains no evidence of anything other than enjoyable visits between the Children and Father during the first part of the case, when he was in an inpatient program and maintained his sobriety. There is no evidence, for

16

example, that the Children were upset when Father stopped visiting in person or called less frequently.  (*Id.* at p. 819.)  And they became upset if he called after drinking alcohol.  Nor was there any evidence Father "played a meaningful role" by taking part in medical appointments or child and family team meetings.  (*Ibid.*)

In sum, considering the totality of the evidence, the only reasonable conclusion in this case is that the benefits of adoption—security and stability—outweighed the harm of severing the parental relationship—loss of the potential for enjoyable visits, which had already decreased in frequency and duration, had become remote rather than in person, and were only enjoyable when Father was sober.

DISPOSITION

The juvenile court's orders under section 366.26 are reversed, and the matter is remanded.  The court shall hold a new permanency planning hearing.  Absent an appropriate showing under section 388 that changed circumstances justify different orders, the court shall terminate parental rights and order a permanent plan of adoption.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

RUBIN, J.

17